[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13056
Non-Argument Calendar

_____

D.C. Docket No. 2:16-cr-00327-MHH-JHE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARRY DEAN GARRETT, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(February 24, 2020)

Before JORDAN, NEWSOM, and ANDERSON, Circuit Judges.

PER CURIAM:

Larry Garrett, Jr., was convicted for production of child pornography, in

violation of 18 U.S.C. §§ 2251(a) and (e).  On appeal, he argues (1) that the district

court abused its discretion by admitting evidence (a) of two sets of sexually explicit drawings he made while in custody and (b) regarding his prior admission to, and conviction for, sexually abusing a child; and (2) that the district court erred by denying his motion to suppress statements that he made to law enforcement officers during a jail interview.  After careful review of the record, we affirm on both issues.

## I. BACKGROUND

In September 2016, a grand jury indicted Larry Garrett, Jr., for production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e).  The indictment essentially alleged as follows.  In 2016, Garrett lived with his cousin, Shareveise Garrett, for approximately two and a half months at her apartment in Birmingham, Alabama.  Shareveise Garrett lived upstairs from Brianna Holmes, whose children—including M.C., the victim in this case—lived with her sister, Kizzy Holmes, but were often in Brianna's apartment.  Larry Garrett went by the nickname "Magic," and spent time with Holmes's children both in her apartment and in Shareveise's.

While Garrett was staying with Shareveise, he provided an SD card[1] to Anthony "Amp" Jones, who lived in the same apartment complex, which

---

[1] A Secure Digital ("SD") card is a memory card used in portable electronic devices.  *See Solo v. SD-3C LLC*, 751 F.3d 1081, 1084 (9th Cir. 2014) (noting that "SD cards are the dominant form

2

ostensibly contained several bootlegged movies on it. However, when Jones opened the files on the SD card, he instead saw a video of a black man with long fingernails masturbating and putting his penis in a child's mouth. Jones could only see a "shadowy figure" and the man's hands, but he recognized the man as Garrett because of the hands' blackness and the long fingernails and because he recognized the voice on the video as that of Garrett. Jones also recognized the child in the video as M.C., and contacted Demetrius Holmes—Brianna and Kizzy Holmes's brother—and informed him that he had a video that they needed to see. Demetrius spoke with Kizzy and told her that they "needed to go now and get the tape."

When Kizzy arrived at Jones's apartment, he showed her the video. She identified the child in the video as M.C., her nephew, and called 911. Several police officers from the Birmingham Police Department responded to the call and watched the video on the SD card, which Kizzy Holmes provided to the police the next day. Shortly thereafter, the police department referred the case to the Federal Bureau of Investigation and sent them the SD card. The Child Advocacy Center conducted an interview of M.C., at which several FBI agents were present.

---

of flash memory card on the market, and are widely used in consumer electronics devices such as cellular phones and digital cameras").

In late May 2016, Garrett was detained by the Randolph County, Alabama, Sheriff's Office for failing to register as a sex offender.  On May 23, while he was detained, Garrett was interviewed by Special Agent Stephen Ferguson of the FBI and Detective Ashley Knighten of the Birmingham Police Department.  At the beginning of the interview, the following exchange took place among Garrett, Ferguson, and Knighten:

GARRETT: And I can have my lawyer present?

FERGUSON: If that's what you want.

GARRETT: I, I would rather have my lawyer present, because most of the time when I do this, it does not turn out good.

KNIGHTEN: So you don't want to talk to us today?

GARRETT: I mean, I would just rather—I would feel comfortable with a lawyer because, like I say, most of the time when I've done this in the past it has always turned out bad.

FERGUSON: OK.

GARRETT: You know, I'm not being funny or anything, but it has always turned out bad.  I don't know what the reason for, you know, other than, uh, I guess, my payee, something about my payee?

FERGUSON: Your what?

GARRETT: My payee for my benefits.  My payee—

FERGUSON: We're not here talking about, we're not here to talk about your benefits or entitlements, that's not what we're here—

GARRETT: Oh, oh, oh, oh.  Then I wouldn't know anybody being in Birmingham.  I wouldn't know—you said you're from Birmingham

4

PD?  The only other person I know in Birmingham, I have a relative in Birmingham, but other than that, you know, she was my payee, other than that I don't know any other reason why—that's why I said payee, she was over my money, my benefits.

FERGUSON: OK.  So my question is, we have some questions to ask you, and we are not here to talk about entitlements, or—we're just following up on an investigation.  It's not concerning your entitlements or your payee, anything like that.

KNIGHTEN: Yeah, nothing to do with money.

FERGUSON: It has nothing to do with your money or whatever benefits you are receiving.  We're not concerned with that at all.

GARRETT: Uh . . . .

FERGUSON: Would you be willing to talk to us and answer a few questions?

GARRETT: And you said I can stop answering at any time?

FERGUSON: Yes, that's one of your rights.  You have the right to remain silent: you don't have to say anything.  Anything you do say can be used against you in court.  And you have the right to talk to an attorney for advice before we ask you any questions—

GARRETT: So if I start talking I automatically cancel out that right for the attorney to be present?

FERGUSON: No.  No, and again, if you want to stop the interview at any time, that's your right to do so.

GARRETT: You've read them all, so I'll just initial them.

After initialing and signing the waiver form, Garrett also stated, "I don't know what this is about just yet, but if it's something I'm not aware of I'm probably going to want to have my lawyer present."  The interview then continued for about

5

two hours.  During the course of the interview, Garrett initially denied knowing

Jones or any of the Holmeses and that he ever lived in Birmingham, but when he

was presented with evidence to the contrary, he admitted to knowing them and

staying with Shareveise in Birmingham.  He admitted making a movie for Jones

but denied owning a cell phone when he was arrested.

Garrett was subsequently indicted on the child pornography charges in

September 2016, and the indictment referred to a 1999 Michigan criminal

conviction for sexual conduct with a person under 13.  Garrett moved to suppress

the statements he made in the interview with Ferguson and Knighten, arguing that

the interview was custodial in nature, that he invoked his right to counsel, and that

the interview continued after he did so.  The government opposed the motion,

arguing that Garrett's request for counsel was not unequivocal and that he

voluntarily initiated further discussion after allegedly invoking his right.  The

magistrate judge held an evidentiary hearing at which Ferguson testified, and

subsequently issued a report and recommendation recommending that the district

court deny Garrett's motion because the interview was not custodial, Garrett's

alleged invocation of his right to counsel was equivocal and ambiguous, and he

voluntarily reinitiated conversation with the agents.  Garrett opposed the report and

recommendation, arguing that his invocation of counsel was clear and that the

agents interviewing him misled, pressured, manipulated, and coerced him to

6

continue the conversation.  The district court accepted the report and recommendation, finding that Garrett blended his requests for counsel with attempts to ascertain what the interview was about and concluding that Garrett's subsequent statements were voluntary.

Separately, the government filed a motion in limine, requesting that the district court admit evidence of Garrett's creation and possession of sexually explicit drawings under Rule 404(b) and his Michigan state conviction for sexual conduct with a minor under Rule 414.  The drawings were hand-drawn images of young boys engaging in oral and anal sex acts with adult men that Garrett possessed while in custody at the Shelby County, Alabama, jail.  The government later learned that Garrett possessed similar drawings at the Randolph County jail, and sought to include those in its motion in limine in its reply brief and at the hearing.  The government argued that the drawings were relevant to show motive, intent, plan, and absence of mistake because they showed Garrett's interest in visual depictions of adults having sex with children.  It further argued that the drawings were relevant to show identity because they were depictions of young boys performing oral sex acts on adult men, like in the video allegedly of Garrett.

The Michigan conviction took place in 1999.  In a police interview after being arrested, Garrett confessed to having oral and anal sex with an eight-year-old child.  He pleaded *nolo contendere* to the charge and was convicted of second-

7

degree criminal sexual conduct.  In the present case, the government argued before the district court that the offense was admissible under Rule 414 because it was a "child molestation offense" included in the Rule's definition and bolstered the victim's credibility by demonstrating that Garrett had a sexual interest in young boys.  In the alternative, the government argued that the offense was admissible under Rule 404(b) because it was not unduly prejudicial and was especially probative given that the limited evidence in the case obscured the identity of the man in the video.

Garrett opposed the motion in limine with a self-styled "motion in absolute prohibitive," which the government construed as a response to its motion in limine. Garrett argued that the drawings were taken in violation of his Fourth Amendment rights and that the conviction was inadmissible because his rights were violated during the 1999 interview where he admitted to the conduct.  He indirectly argued that the drawings and offense were improper character evidence.  Garrett's standby counsel argued that the drawings were irrelevant and not probative because they did not help identify Garrett as the man in the video because they did not depict Garrett committing the sexual acts—and in any event, the drawings were highly prejudicial.  After the government presented several witnesses to demonstrate that Garrett's constitutional rights were not violated in the 1999 interview, Garrett and his standby counsel reasserted their previous arguments.  Counsel added that the

8

offense was inadmissible because it was too remote and that the drawings were improper character evidence that did not go to plan, design, scheme, motive, or intent because they were unrelated to the video and their admission would confuse the issue.

Ultimately, the district court denied Garrett's motion. As to the drawings, the district court concluded that they were "incredibly relevant" to identifying the person in the video and were therefore admissible under Rule 404(b). And as far as its applicability to the statements Garrett made in 1999, the district court determined that his motion was an improper attempt to suppress his statements. It further concluded that the offense was admissible under Rule 414.

Garrett proceeded to trial on the offenses and maintained his innocence throughout, arguing that the evidence showed that the man in the video was Jones, not him. He was found guilty and the district court sentenced him to a 600 month prison term, followed by supervised release for a term of life. Garrett timely appealed to us.

## II. ADMISSIBILITY OF EVIDENCE

### A. Standard of Review

We review the district court's determination on the admissibility of evidence for an abuse of discretion. *United States v. Baptiste*, 935 F.3d 1304, 1311 (11th Cir. 2019). As a result, the complaining party must show that the court's ruling

9

had a "substantial prejudicial effect." *United States v. Breitweiser*, 357 F.3d 1249, 1254 (11th Cir. 2004) (quotation omitted).

To convict a defendant of production of child pornography, 18 U.S.C. § 2251(a) (which is in Chapter 110 of Title 18) in part requires the government to prove that the defendant used, persuaded, induced, enticed or coerced a minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct. 18 U.S.C. § 2251(a).

## B. Admissibility of Garrett's Drawings

Under Rule 404(b) of the Federal Rules of Evidence, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Notwithstanding that general prohibition, extrinsic evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). As we have routinely explained, we use a three-part test to determine whether extrinsic evidence is properly admitted under Rule 404(b): "(1) the evidence must be relevant to an issue other than defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; [and] (3) the government must offer sufficient proof so that the jury could find that defendant committed the act." *United States v. Ellisor*, 522

10

F.3d 1255, 1267 (11th Cir. 2008) (citing *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005)).

When examining the probative value of an extrinsic act, we consider the government's need for the evidence to prove the defendant's guilt, the similarity between the extrinsic act and the charged offense, and the extrinsic act's temporal remoteness from the charged offense. *Culver*, 598 F.3d at 748.  A limiting instruction may be provided to reduce the prejudicial impact of extrinsic evidence. *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998).

On appeal, Garrett argues that the district court abused its discretion in admitting the drawings under Rule 404(b) because their prejudicial effect greatly outweighed their probative value.  The crux of his argument is that the drawings were irrelevant in establishing the identity of the man in the video and only served as improper propensity evidence.  We disagree.

As an initial matter, we have no doubt that the drawings were prejudicial. We have noted previously that "a reasonable jury undoubtedly would" find evidence of "child pornography very inflammatory." *United States v. Hersh*, 297 F.3d 1233, 1243 (11th Cir. 2002).  The inflammatory nature of the kind of evidence that is usually necessary to achieve a conviction in a case like this was reflected in the trial transcript.  Relatively early on in the trial, the district court, after excusing the jury to hear argument on an objection, "want[ed] the record to

11

reflect that one of the jurors had his hand over his mouth and looked like he might become ill" while Kizzy Holmes was testifying about the video of Garrett and M.C.  But this sort of evidence, however inflammatory, is frequently necessary to achieve a conviction on charges of child molestation or production of child pornography.  We have recognized that while the evidence may be inflammatory and prejudicial, so is the underlying conduct.  *See Hersh*, 297 F.3d at 1243.

Accordingly, while the drawings were prejudicial, they were also probative. While we have not had occasion to comment on the probative value of self-drawn drawings or cartoons, we do have analogous precedent.  In *United States v. Woods*, for example, we concluded that a defendant's "typed statement describing his molestation of his niece" was probative of the defendant's "interest in child pornography" and of the identity of the person who was responsible for downloading child pornography on his computers.  684 F.3d 1045, 1065 (11th Cir. 2012).  Similarly, in *McGarity*, we allowed the introduction of a similar statement under Rule 403 because it was probative of the defendant's identity where he took steps "intended to avoid detection" because it helped make the Government's case "believable but also understandable."  669 F.3d at 1245 (quoting *United States v. Lopez*, 649 F.3d 1222, 1247–48 (11th Cir. 2011)).

This reasoning is applicable here.  Though Garrett suggests that he used the drawings as a coping mechanism to deal with sexual abuse that he suffered as a

12

child, it is a reasonable inference is that Garrett drew the pictures because he was interested in depicting sex with children. While the drawings certainly do not establish as a certainty that Garrett was the man depicted in the video, they are certainly probative of that question. And Garrett's main defense was that *Jones* was the man depicted in the video—making the question of the man's identity central to the entire trial. Accordingly, the government had a specific need for the evidence in order to prove Garrett's guilt. *See Culver*, 598 F.3d at 748.

Therefore, while the drawings were likely prejudicial, as most evidence in child pornography and molestation cases is, the prejudice caused by their admission did not *substantially outweigh* their probative value, as Rule 404(b) requires for exclusion. We cannot conclude that the district court abused its discretion in this regard.

### C. Admissibility of Garrett's 1999 Conviction

Though the Federal Rules of Evidence "generally prohibit the admission of propensity evidence, . . . they provide a specific exception for 'child molestation' cases." *United States v. McGarity*, 669 F.3d 1218, 1244 (11th Cir. 2012) (citing Fed. R. Evid. 404(b), 414(a)). Rule 414(a) states, "In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 414(a). "Child

13

molestation" is defined in part as any crime under federal or state law involving "any conduct prohibited by 18 U.S.C. chapter 110," as well as "contact between the defendant's genitals or anus and any part of a child's body." Fed. R. Evid. 414(d)(2)(B); *see* Fed. R. Evid. 414(d)(1) (defining "child" as a "person below the age of 14").

Evidence admissible under Rule 414 still must satisfy the requirements of Rule 403 of the Federal Rules of Evidence. *United States v. Woods*, 684 F.3d 1045, 1064 (11th Cir. 2012). Rule 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. When assessing a district court's ruling under Rule 403, we view the evidence in the light most favorable to admission, maximizing its probative value and minimizing its prejudicial effect. *United States v. Bradberry*, 466 F.3d 1249, 1253 (11th Cir. 2006).

We have no difficulty in concluding that the district court did not abuse its discretion in admitting Garrett's 1999 conviction for sexual conduct with a minor. The conviction was not introduced as propensity evidence, but rather for other "relevant" matters, like intent or identity. Moreover, the introduction of the conviction also satisfies Rule 404(b)'s requirements—again, while the conviction was assuredly prejudicial, the prejudice it caused Garrett did not *substantially* outweigh the probative value. We affirm.

14

## II. MOTION TO SUPPRESS

In assessing a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*, construing all the facts in the light most favorable to the prevailing party. *United States v. McCullough*, 851 F.3d 1194, 1199 (11th Cir.), *cert. denied*, *McCullough v. United States*, 137 S. Ct. 2173 (2017). However, harmless error review applies to decisions denying motions to suppress on Fifth Amendment grounds. *United States v. Arbolaez*, 450 F.3d 1283, 1292 (11th Cir. 2006). Generally, the test for constitutional errors argued on direct appeal is harmless beyond a reasonable doubt. *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015).

Statements a suspect makes during a custodial interrogation are inadmissible unless the law enforcement officers inform the suspect of his Fifth Amendment rights, including the right to have counsel present during an interrogation, and the suspect waives those rights. *Miranda v. Arizona*, 384 U.S. 436, 468–76 (1966). A suspect is in custody for purposes of *Miranda* when there are "circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). The test is objective, requiring consideration of whether a reasonable person would have felt that he could stop the interrogation and leave. *Id.* at 509.

15

Once a suspect in a custodial interrogation invokes his right to counsel, law enforcement officers cannot continue to interrogate him until counsel is provided, unless the suspect initiates further communication. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).[2] Nonetheless, the officers are not required to stop an interrogation when a suspect fails to unequivocally invoke his right to counsel. *Davis v. United States*, 512 U.S. 452, 461–62 (1994).

Determining whether a defendant had invoked his right to counsel is an objective inquiry, requiring, at a minimum, a statement that can be reasonably construed as a desire for an attorney. *Id.* at 458–59. "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the officer may continue to question him. *Id.* at 459 (emphasis in original).

If the suspect invokes his right to counsel, *Edwards* does not exclude statements he made after initiating further discussion with the officers and knowingly and intelligently waiving the right that he had invoked. *Oregon v. Bradshaw*, 462 U.S. 1039, 1041–46 (1983). To "initiate" a conversation with law

---

[2] In *United States v. Valdez*, we applied the harmless beyond a reasonable doubt standard to an *Edwards* violation. 880 F.2d 1230, 1234 (11th Cir. 1989).

16

enforcement, a defendant's statement must evidence "a willingness and a desire for a generalized discussion about the investigation." *Id.* at 1045–46.

We conclude that the district court did not err in denying Garrett's motion to suppress. While we think that it was likelier than not that the interview was custodial—Garrett was in jail having been arrested on a state charge, he was being interviewed by two law enforcement officers in a small interview room, and he testified that he was handcuffed—Garrett's references to counsel were ambiguous. He merely *suggested* that he may have wanted his counsel present but, as the district court determined, this may have been an indirect attempt to ferret out from the officers the purpose of the interview. Moreover, even assuming that Garrett made an unambiguous request for counsel, we agree with the district court that Garrett voluntarily, knowingly, and intelligently reinitiated further communication with the officers thereafter. Accordingly, we affirm the district court's denial of Garrett's motion to suppress.

## IV. CONCLUSION

We affirm the district court's granting of the government's motion in limine regarding Garrett's drawings and 1999 Michigan state conviction for sexual conduct with a minor. While this extrinsic evidence may have been prejudicial to Garrett, it was also highly probative of critical issues in the trial—including the identity of the man in the video. We also affirm the district court's denial of

17

Garrett's motion to suppress the statements he made in an interview while detained because we conclude that Garrett's request for counsel was ambiguous and that he reinitiated conversation with the officers.  In sum, the district court's order and Garrett's conviction are

**AFFIRMED.**